## NATIONAL LABOR RELATIONS BOARD v. NORRIS, Inc.

### No. 11893.

Circuit Court of Appeals, Fifth Circuit.

June 16, 1947.

Gerhard P. Van Arkel, Gen. Counsel, N.L.R.B., A Norman Somers, Ass't. Gen. Counsel, N.L.R.B., and David C. Sachs.

Atty., N.L.R.B., all of Washington, D. C., for petitioner.

Smith, Kilpatrick, Cody, Rogers & McClatchey and Ernest P. Rogers, all of Atlanta, Ga., for respondent.

Before HUTCHESON, WALLER and LEE, Circuit Judges.

LEE, Circuit Judge.

The NLRB petitions for enforcement of its order directing Norris, Incorporated, to bargain collectively with Bakery and Confectionery Workers' Union No. 42, AFL, as exclusive bargaining representative, with certain exceptions, of Norris, Incorporated's inside workers.[1]

The question presented involves the result of an election as declared by the Board, by which the Bakery and Confectionery Workers' Union was chosen as exclusive bargaining representative of the appropriate unit.[2]

Because of a strike begun on November 16, 1944, current at the date of the election, the Board, in accordance with an agreement of the parties, declared eligible to vote at the election those employees who were on Norris' pay roll during the week beginning November 13, 1944, and those who would have been thereon that week but for illness,—excluding those who had since quit or been discharged for cause. The election was held on February 16, 1945, and resulted in 209 votes being cast. Of these, 71 were for union representation, 81 were against union representation, and 57 were challenged ballots. Following an investigation in accordance with its procedure,[3] the Board ordered 35 of the challenged votes counted; 26 of these were for representation, 9 were against. The result of the election was then found to be 97 votes in favor of union representation and 90 votes against. Thereupon, the Board certified the union as the bargaining representative of the unit. Upon Norris refusing to bargain with it, the union filed charges with the Board, alleging violation of section 8(5) of the National Labor Relations Act, 29 U.S.C.A. § 158(5). To expedite matters, all parties stipulated that further proceedings before the Board be dispensed with and that an order be entered by the Board directing Norris to bargain with the union, reserving to Norris the right to challenge the Board's order in this court on the ground that the union had not been selected by a majority of the employees in the unit.

The controversy here revolves around (1) the Board's finding that Opalee Butler, Lois McConnell, Emma Pirkle, Lillian Burton, Willie Daniel, and Ruth Petty were employees of Norris at the time of the election, and its order that their challenged ballots be counted; (2) the Board's finding that the regular work of four others—Asher Lee, Onnie McKinney, Paul Lowe, and Rupert Redmon—was such as to exclude them from the unit, and its order that their challenged votes be not counted; and (3) the Board's finding that one Nelle Gentry was not a factory office worker, and its order that her challenged vote be counted.

Norris contends that these findings were not supported by substantial evidence, hence that the orders are erroneous.

[1] Norris, Incorporated, is a Georgia corporation having its principal office and place of business in Atlanta, Georgia, and being engaged in the manufacture, sale, and distribution of candy. It purchases substantial amounts of raw materials outside the State and ships most of its finished products to outside points. Jurisdiction in the NLRB is conceded.

[2] The appropriate unit fixed by the Board embraced "all inside workers of the Company, including the truck driver, but excluding office workers, sales department employees, factory, office workers, mechanic and maintenance employees, porters, cafeteria employees, box department employees, elevator operator, printer, assistant foreladies, and all other supervisory employees with authority to hire, promote, discharge, discipline, or otherwise effect changes in the status of employees, or effectively recommend such action."

[3] The Board's rules and regulations in effect at the time of the election provided as follows: " * * * if the challenged ballots are sufficient in number to affect the result, the designated agent shall investigate the issues raised by such * * * challenges * * * and shall prepare and serve upon the parties a Report upon the Challenged Ballots * * *, including his recommendations, which report, together with the Tally of the Ballots, he shall forward to the Board in Washington, D.C."

It is to be noted that the Board in its order fixing eligibility to participate in the election excluded those employees on the November 13, 1944, pay roll who had since quit or been discharged for cause. The personnel absenteeism at the time of the strike was shown to be pronounced, and it was not possible in some cases to tell whether an employee was on strike or had quit. The six found by the Board to be employees of Norris at the time of the election had made application to other employers for employment. The Board contends that the employment sought was temporary. As proof of this, the Board relies upon a general understanding the union had with the new employers that any former employee of Norris would be released if she desired to return to work for Norris. Norris contends that the six had left its employ. To prove this, it filed in evidence the written applications of the six employees for new employment. These applications, filled out and signed by the applicants, show that four of the six continued in Norris' employ until January, 1945, one to November, 1944, and one to November 16, 1944. Each of them received a referral card from the United States Employment Service and submitted it along with the application for new employment.[4] Four of the six were employed elsewhere at the time of the election. One had made no application for new employment prior to that time; her application was made in April following the election in February, but she, as the others, had written "Quit" in her application as her reason for leaving Norris' employ. The remaining employee obtained new employment prior to the election but left that job after working one night, (she desired daytime work, and no job on a day shift was available). Of the six, she was the only one called as a witness by the Board. She was asked: .

"Q. Now, Miss Burton, was that a temporary job you had at National Biscuit? A. Well, I didn't ask him if I could come back to Norris, but I thought it was understood when the strike was settled I might come back.

"Q. Did he [referring to the employer] say anything to you? A. He did not; not."

None of the six gave the strike as a reason for terminating her employment with Norris. Five said in their applications that they had "quit";[5] one said that she had "resigned".[6] The strike was called on November 16, 1944. Four of the six in their applications stated that they were employed by Norris until January, 1945, some two months after the strike was called. The evidence refutes any inference that at the time of the election the six were employees of Norris. The Board's order that the six challenged votes be counted was erroneous.

The four employees whose ballots were ordered not counted were found by the Board not to be within the unit. The unit, according to the Board's order, embraced "all inside workers of the company except * * * porters * * * and all other supervisory employees with authority to hire, promote, discharge, discipline, or otherwise effect changes in the status of employees".

Though the unit finding made no men-

---

[4] The movement of employees from one employer to another was controlled by the War Manpower Commission. Atlanta, Georgia, was termed a critical area, and, in order for an employee to leave a current employer, he was first required to obtain from the United States Employment Service a referral. It was a rule in the Employment Service in the Atlanta area that where a strike was in effect no employee could be referred to another employer during the pendency of the strike and that no prospective employee would be referred to the employer.

[5] Emma Pirkle, in her application, stated that she was in the employ of Sears, Roebuck & Co. from 1940 to 1943, of Williams Candy Co. from March, 1943, to August, 1944, and Norris Candy Co. from August, 1944, to January, 1945. She made no distinction with respect to leaving the employ of any one of them; as the reason for leaving the employ of each she wrote the word "Quit".

[6] Willie McDaniels, in her application for employment, stated that she worked for National Biscuit Co. from August, 1943, to September, 1943, and for Norris Candy Co. from October, 1943, to November 16, 1944. She assigned as a reason for leaving the employ of each, "Resigned".

tion of this employee category, the Board found that Asher Lee, whose vote was challenged by the union on the ground that he was a chemist but who the company asserted was a chemist who also made candy, spent approximately 10% of his time in technical work, 30% in making candy flavors, and 60% in non-clerical routine jobs, and further found that Lee had supervisory authority over certain helpers. Norris moved for reconsideration and called attention to testimony to the effect that Lee, though referred to as a "chemist", spent only 10% of his time in the work of a chemist and spent 90% of his time in the production of candy; this was so found and so reported by the Regional Director. As for the element of supervisory authority, Norris set forth the fact that no evidence indicates that Lee had such authority and that the Board undoubtedly confused Asher Lee with his father, W. H. Lee, who did have such authority. After consideration of the Norris motion, the Board held that it was not necessary to determine Lee's supervisory status and sustained its original holding of ineligibility on the theory that Lee was a highly trained technician whose duties were different, in large measure, from those of production employees.

As the uncontroverted record shows that Lee devoted 90% of his time to candy production and non-technical routine jobs in the factory, to exclude him from the election as a highly trained technician not only reads into the Board's definition of the unit an exclusion not therein set forth, but gives the term "technical employee" a scope without substantial support in the evidence. Lee's ballot should have been counted.

The three remaining employees, McKinney, Lowe and Redmon, whose votes were not counted were found by the Board to be porters. Porters were expressly excluded under the Board's order creating the unit. Of McKinney, the Board said: "McKinney is engaged substantially all his time in carrying to the packers empty boxes, tissue paper, and trays for these boxes and miscellaneous materials used in packing, and in carrying away boxes after they are packed. [5]"

The marginal note is as follows: "5. We note that the Dictionary of Occupational Titles and the Job Description for the Confectionery Industry, published by the Department of Labor in 1939, define a porter as one who keeps the working area in production departments in a clean and orderly condition, who sweeps the floors and aisles, who tidies working areas by arranging hand trucks, boxes, materials, and other articles in an orderly manner. In the confectionery industry a porter, besides performing the work described above, would also be charged with the duties of cleaning and scrubbing any and all candy cooking and candy handling equipment."

The evidence shows that McKinney worked in the packing room. He fed the packing belts or lines with boxes in which candy was packed. His job was essential to production. The fact that he and other employees worked "extra" on Saturdays when the factory was not in operation, cleaning up the premises which were cleaned on work-days by a maid, may not control his status as a workman.

Lowe worked in the starch room. He handled starch trays, brought sugar to the candy makers, carried candy to the cooling room and used-starch to the hothouse. At the close of the day he assisted in cleaning up the starch room.

Redmon brought sugar to the candy makers and collected and stacked candy trays. Occasionally he mopped the floor.

The Board argues that McKinney, Lowe, and Redmon "were not production workers within the meaning of the unit description". But, as respondent points out, "the Board did not purport to confine the unit to 'production workers'. The definition was 'all inside workers' ". The definition of a porter relied on by the Board in McKinney's case does not include the duties performed by him, by Lowe, or by Redmon. No substantial evidence supports the Board's finding that these employees were porters. Their votes should have been counted.

The eligibility of Nelle Gentry was challenged by respondent. The Board in its brief summarizes her duties as follows: "Gentry was a production clerk in the packing department (B.A. 55, 91). She worked

---

[5] See note 5 on page 52.

in the main packing room and prepared the daily production records of the packers for use by the factory office in determining their weekly wage on a piece-work basis (ibid). She also made up production schedules, showing the types and amounts of candy packed (B.A. 55). She had no authority over any of the packers and was not responsible for the quality or quantity of their work, but simply recorded the quantities produced (B.A. 55, 68, 91). For three or four hours each day, when her clerical duties were finished, she usually performed such production jobs as making and packing containers and running the cellophane machine (B.A. 55, 91, Tr. 557)."

The Board's order expressly excluded "factory office workers". The regular duties of this employee excluded her. Her vote should not have been counted.

Enforcement of the Board's order is refused.